Department of Children and Family Services, Council. You may proceed. Thank you. May it please the Court, Robert McGuire, Deputy Attorney General from the Office of the New Jersey Attorney General for the Appellants Cordero and Moody, and for the Cross Respondents Henningsen and Egu Onyema. I'd like to reserve three minutes time rebuttal with the Court to approve. It's done. Thank you, Your Honors. Let me make sure I understand. Your co-counsel, Mr. Sarno, is representing who? Good morning, again, Your Honor. Deputy Attorney General Michael Sarno on behalf of the Cross Appellees Victoria Cerda and Monica Vila. Okay, thank you. Yes, and then just more to highlight, the Karras Defendants is referred to as the Karras Defendants. All right. That's who I am. Thank you. All right, please proceed, Mr. McGuire. Thank you, Your Honors. This Court should reverse the decision of the District Court, which found that Defendants Cordero and Moody did not have qualified immunity because the District Court ineptly found that cases involving instances where case workers were specifically aware of the significant likelihood of future intentional sexual or physical abuse based on an established record that such intentional abuse had already occurred put the defendants here, case workers, on notice that they should have known they were violating constitutional rights in the very different factual circumstances here. What troubles me about this case, frankly, is it seems to me clearly that there are issues of fact here that are not appropriate for some of the judgment. I understand the qualified immunity doctrine, obviously, and the very strong and important policy reasons behind having qualified immunity so that people in positions such as a client's are not subjected to suit at all, let alone having to go through a trial. But you only get there if there's no disputed material issues of fact that would go to whether or not the prongs of the qualified immunity test have been made out. It seems to me there are genuine issues of fact here. Well, Your Honor, I believe that the District Court construed the record most favorably. Whenever there was a factual dispute, the District Court said, I'm going to accept the plaintiff's version. And even accepting that version... But just because the District Court said, look, this is how I think the most favorable version is, does that mean that we're bound by that? Are we free to look at the record and say, you know what? This is the sort of case where facts ought to get developed at trial, and a finder of fact ought to decide just how much information was actually available to these defendants. By these defendants, we're talking about the two who didn't get qualified immunity. So we're, you know, the record's absolutely clear on that. We understand that. But there's... yeah. So how much should we attribute, for example, to these defendants based on what they should have known? Isn't there an aspect here about not just what you knew, but what you should have known? Or should have reasonably concluded from what you, in fact, did know. Right. There is, within the court's review of this, the possibility of saying that these persons should have known more. The court can say, I think maybe they did. But you have to take that in account of the factual record here, which involves... This is a discretionary decision not to remove a foster child, where there was a handful of lapses that occurred within a few days. Well, when you say there's a handful of lapses, that's the very thing I'm trying to press you on and get an answer to. There are at least eight, I think, separate incidents where the daycare says, this little girl's bruised again. This little girl's injured again. This little girl's got unexplained rash or problems that are very troubling. There's indications of abuse. This happens on eight different cases, if I read the record right. And then the assertion is, yeah, the transport people for the department say they... There's a lot of finger pointing. They seem to say, yeah, we told. And other people say, no, they didn't tell. Isn't that, like, a classic factual issue to be determined by a jury, whether that information made it up the chain and these people who are professing, we didn't know, actually did know or should have known? Your Honor, what we need to do for purposes of Cordero and Moody is look at only the information that was available in the period between August 27 and October 10. That's the period where they are involved with this family. And that's the totality of the circumstances this court has to consider is what did those defendants know based on the record that was developed? And based on the record that was developed in the trial court, the only instance that they were aware of with respect to an injury to Allison was this one instance on September 27. With respect to Sharon... Are you saying that those eight reports happened after? They happened before. Your Honor, not before October 10, 2012. That is the date at which Cordero and Moody are no longer involved. So the issue is what does the record show as to what they were aware of? And the record showed that these defendants were aware of a single instance of a report from the daycare which said only that a different child had a split lip, which was explained by the fact that this child supposedly had been in a fight with another child, and the fact that Allison had a diaper rash. That was the information from the daycare. Two black eyes. That was as a result of, I'm saying this before the incident where she fell. So no doubt. Wait, but didn't they know, didn't these two folks know that she reportedly fell? Absolutely, Your Honor. And after that happened... It was not referred to any medical care, any kind of professional medical care, and then there's some violations of internal policies also went there. Your Honor, with respect to the child falling, the first information that reached, the first reach out was the day after the incident. And it's helpful because Wesby says we need to look at the totality of the circumstances. And you have to judge what Ms. Cordero and Ms. Moody did by actually what the facts were known to them at the end of this series of events over a course of several days. So on October 2nd, when a doctor has declared Allison is healthy, when the resource parent has said, you're right, I screwed up, I'm not going to do it again, when the resource parent has actually made the next appointment... Isn't what you just recounted the light most favorable to your clients? No, Your Honor. It is absolutely reflected by the record. Well, I'm not saying it's not supported by the record. That isn't the question. You can absolutely tell a good story and a persuasive story. And a jury may say, I am persuaded by that, that these were good and hardworking people who were doing their best in a difficult job. They shouldn't be held liable. They shouldn't be said to be deliberately indifferent. That's not the question we're wrestling with. It's not that you don't have a case. The question is, do they have a case that should make a past summary judgment? So maybe I'm not clear enough in understanding the factual background here, but I thought that during the period that your clients, Ms. Cordero and I apologize... Ms. Moody. Ms. Moody, thank you. Ms. Cordero and Ms. Moody were in the loop that Moody is supervisor, Cordero is frontline person, they were around when reports, some of these reports at least, were coming from the daycare center, right? So the only information from the daycare center that the record indicates made its way to Cordero and Moody... That's not my question, and I apologize. I'm not asking you what the record shows made it to. I'm asking you whether or not there's evidence in the record that the daycare people say, we were telling the department this. We were giving this information to the department. And in fact, some evidence that the transportation people say, we passed it on, even though Cordero and Moody say they never passed it on. Isn't that in the record too? What is in the record is daycare did say that they told the transport officers, and the transport officers did say in the record that they believed that their habit would have been to pass those reports along. Okay, so isn't that factual information that would bear on the knowledge and the deliberate indifference question? It does, but the question is, Your Honor, the factual record. And these are facts. These are not my opinions. The factual record is the only documents that reached Cordero and Moody, based on the record developed, was the single instance involving Sharon and the split later... When you put document in there, you're putting the rabbit in the hat, because there's some dispute about whether or not some of the information that should have been documented wasn't documented. So what they got by way of document is not that helpful. And it seems to me at the very beginning there's some issue about whether or not a jury could conclude that the very placement with this family should have raised red flags, because there was some dispute, at least on the part of Cordero and Caras, the Caras defendants, as to whether or not the family that the kids were placed with were capable of handling five children. I'm not sure many families are capable of handling five children. Your Honor, again, this goes to the totality of the circumstances, and what has to be done is to view the decision made at the time it was made. There is indication in the record... Who does that? Who views that decision? Who assesses that decision? This Court makes the decision, but the Court has to... Again, I will talk about the facts that were known on October 2, which is really, I think, the decision point, because at that point, Moody is aware, Cordero is aware of what's happened, has done her own investigation, a doctor has examined the child, she has spoken to the resource parent, and she's gotten information from the resource parent, and she knows the resource parent has now made an appointment for another doctor's visit to have the child evaluated. She knows the doctor says the child is healthy at this point. That was after the fall of the two black eyes, the bad discoloration came to light, and it was determined that even though told you should, you know, you waited, you should have taken the doctor, I mean, it just seems so blindingly obvious that if a child suffered that traumatic of an injury, that it's evident that you wouldn't wait to take the child to the doctor, you wouldn't be calling around to ask other people whether to take the child to the doctor, you wouldn't wait days before you spoke to the person at the department to decide to take the child to the doctor. But after all that, she still, the foster mother still didn't take the child and make the appointment. It wasn't until Cordero said, did you make the appointment yet, which was on Monday, October 1st. And the answer was no, and then she said you have to do it. And she did. Yes, she did after all that. Like this business of we're looking at this in the light most favorable to your client, the way you're presenting it. I'm asking these questions not because I've got some brief against your client. I don't. I'm just a little, I'm having a little bit of a challenge because understandably you're not maybe embracing the other side's view of this, but isn't it at least plausible that a jury looking at that could say, well that in connection with the other things, that's a level of indifference that's genuinely troubling. Yeah, I could, in other words, is it beyond any rational juror to say that's not just negligent. That's past negligent. Your Honor, consistent case law for the Supreme Court with consistent warnings of the Supreme Court has said that you cannot define these sort of cases by saying there is some sort of general overriding principle and use that. It has always said that you need to find something similar in the totality of the circumstances. And I just want to account for Your Honor's. Something similar. Now are you on to whether there's a robust consensus? Now are you moving away from the facts to the notion of. Your Honor, I am not. But before we reach the totality of the circumstances and similar circumstances, I would like to lay out just soup to nuts from the beginning, undisputed facts about what occurred and what these particular workers did or did not do. And this is what we know. There were a handful of lapses, no doubt, by the resource parent. But the resource parent did reach out twice to self-report this incident before the agency was aware. So there were two reach outs by the resource parent. So the resource parent is not hiding this incident. There was no evidence to that point when this incident occurred that there was any intentional physical or sexual abuse that had come to defendant. Again, Your Honor, I would. What? That had come to defendant Moody or Cordero's attention. Why do you say that that's a matter of fact? Because, Your Honor, it's reflected in the record.  Is it not in the record that there were multiple statements by the daycare to the transportation people? And is it not in the record that the transportation people said, that is exactly the information we would pass on? Now, I understand that your clients say, we didn't hear it. But I put it to your counsel, is not that something that typically a jury would listen to and say, well, I don't believe Ms. Cordero. And I don't believe Ms. Moody. I'm allowed to do that. I'm inclined to believe the transportation officials that they told them and these people didn't act on it. No, they said that you believe Cordero. If there was information in the record, Your Honor. There's testimony from the transportation officials. That's in the record. But if there was record that those incidents and those reports were passed to the drivers before October 10, when Ms. Cordero and Ms. Moody were no longer involved. Again, setting the stage for October 2, where a discretionary decision is made. Okay. The resource parent has now accompanied Ms. Cordero to the doctor. The doctor has said the child. It's not that simple. Because there was an incident that was not reported. I believe the incident was related to Ms. Cordero. And she didn't report it. And you're saying, well, the kid did get to the doctor. Yeah, after prodding, she got to the doctor. Correct, Your Honor. Again, again, it's the totality of the circumstances. When we get to the end of the day in October 2, there was a lapse. No doubt that the resource parent did not bring the child. Ms. Moody and Ms. Cordero say that's not acceptable. We need to get this child to a doctor. And they get that child to a doctor immediately. Ms. Cordero herself drives the child there. The doctor says this child is alert and healthy. The resource parent says, you're right, I screwed up. I shouldn't have done it. I shouldn't have handled things the way that I did. I won't do it again. And it's a demonstration of the fact that I'm going to be responsible going forward. I've already made the next doctor's appointment. Ms. Moody then. What you're doing is exactly what Judge Jordan said you were doing. Basically, you're now giving us the summation you give to the jury at the end of the trial. Your Honor, I'm not. I am telling you what the facts are that this Court needs to use to make its determination. But you're only telling us the facts that you would like. The whole point of this exercise – I am not, Your Honor. Well, it's helpful if only one voice is heard. The only thing that we've done in the last few minutes is my colleagues have encouraged you to look at – you keep talking about the totality, and you're not looking at the totality. You're looking at those key facts that you would like us to focus on. No, Your Honor. What I am doing is I am adding those facts to the mix. I'm so sorry. One at a time. I understand, Your Honor. I know it's difficult. Just to finish the thought, what you're doing is focusing on those facts which you'd like us to focus on, and that's not our job at this point. Your Honor, respectfully, what I am doing is I am introducing those facts into the mix. I am not saying that those other facts did not occur. I am saying that, as Wesby says, you need to look at the totality of the circumstances. And the way the Court appears to be viewing this currently is that we need to accept only the version of one side and can't take the undisputed facts to the other side. Undisputed. That's not true, Mr. White. And put those together. That's what I'm saying, Your Honor. Okay. I'm not saying, Your Honor, Judge Greenway, absolutely, there are facts here that say that there's a potential. Mr. McGuire. Yes, Your Honor. Your papers are in. We've given, I think, an extra five, six, seven minutes. So, and you're on our time now. It doesn't hitch your rebuttal. But it really is, I know it's an artificial thing. In ordinary conversation, people speak over each other. But this is not an ordinary conversation. So, please understand, we do not intend to be rude. But when we're speaking, you've got to stop speaking. And we've only been dealing with facts here. I want to give you just a couple minutes to address what you think is your best legal point. I'm a little concerned about your assertion that there's no, that this is unsupported by the case law. So, talk to us about why, in light of the Youngberg case, the Ledbetter case, the Doe X. Rel. Johnson case, those kinds of cases we shouldn't say, or our own Yesenia case, we shouldn't say, there's a consensus here. There's an obligation here. And it's an obligation to make sure that children are not put at serious risk. That's a constitutional right. If you've got a position that says, oh, no, that's not the right way to frame this, go ahead and make your pitch now. We've got it in the papers, but I'll give you a chance to do it now. Thank you. I appreciate the honor. And I apologize to the extent that I over-talked anybody. I was concerned about the nine minutes and making sure they were pointed. But you're done. I mean, we're way past your nine minutes, but I'm giving you a chance to do it. Okay. The reason why qualified immunity is appropriate here is because there is no factually analogous circumstance to this case. If this court were to affirm a finding that this set of caseworkers did not have qualified immunity, caseworkers who do not have qualified immunity, wouldn't it be a statement that we're not giving qualified immunity at this time because there's facts to be developed? Your Honor, my argument would be even taking the facts as the court views most favorably, even this court takes a different view of all the facts, takes a different view of some of the facts and says there are additional facts and it's a mix, even using that as the totality of the circumstances, this would be the first decision within this circuit, within any other circuit court, or in the Supreme Court where a caseworker has been found civilly liable, this person whose every decision every day involves the calibration of there's some risk. If I remove a child, there's a risk. If I don't remove a child, there's a risk. If I remove a child to a new foster home, there's a risk. Every decision involves risk. This person can be liable for what happens to a child who is healthy, who had a nonintentional injury in the absence of any indication to the particular persons who are trying to be held liable that there was intentional physical or sexual abuse of a child happening. That is the circumstance these people are confronted with. There is not another case. Obviously, there is. I think we're into back to the facts, and we've heard you on that, and we will hear you on rebuttal, Mr. McGuire. So thanks for your argument. We'll go ahead and turn the podium over to Mr. Sarno, and we'll have you back on rebuttal, sir. Thank you. Thanks. Please. Good morning, Your Honors, and may it please the Court. I'm Deputy Attorney General Michael Sarno. I represent the Karras employees, Victoria Serta and Monica Avila. With regard to the threshold issue, the Pendant Appellate Jurisdiction, my clients, the issue of their non-liability of these Karras employees, are independent from that of the potential liability of the DCF defendants. The reason is because they stand in fundamentally two different positions. Given that Karras had no power over the custody, the placement of Allison, they had no power over the license of the foster parents. It's why the district court separated the two into different categories. Now, the fact that the plaintiff complains that, well, they both violate the same constitutional amendment, they cause the same harm, that's insufficient for Pendant Appellate Jurisdiction and the necessary entanglement needed to get jurisdiction. That is, there's no inextricable intertwining of the two. They're two different state arms with two different powers and two different roles. But they are state arms. I mean, you're not suggesting they're not state actors, are you? Oh, no, Your Honor, yes. My clients were part of Kean University, which is a state arm. Absolutely, Your Honor. But it's not necessary to look at the cross-appeal against my clients in order to decide the other underlying appeal, Your Honors. And so Pendant Appellate Jurisdiction should not be granted here or conferred. If, Your Honors, you do look at the merits, however, then as a district court, we ask that you affirm the district court's decision. With regard to qualified immunity, there is no violation, there is no constitutional duty that even arose here, let alone the violation of a constitutional duty or the violation of clearly established law, given that my clients had no special relationship under the exception for the Due Process Clause. To the point, the plaintiff cites not one case that resembles the facts that would support a duty that arose in my clients when they had no custody over Allison, they could not exercise any power to place Allison, they had no power over even the foster parents. In fact, they didn't even recruit this family for the foster care system. That was a referral. The lack of case law, Your Honors, is fatal to the plaintiff's cross-appeal against my clients because there was no notice to my clients that what they did or did not do could have possibly constitutionally been wrong. The Cheney here is the most instructive, and it supports my clients' non-liability because there was no special relationship. Well, there's almost, you know, perhaps we should have done this differently and had Ms. Navis up here, because you're arguing a little bit into the void, right? You won. Yes. You like what happened. Yes. So we probably should have heard from the other side first, but you've seen their paper, so why don't you go ahead and address their assertion that these things are, in fact, intertwined. This is all one set of facts. It's not like the CARES defendants were, you know, showing up three months later or something. It's all together, and understanding it requires understanding it all together. Just take that head on. Sure, Your Honors, and I notice my time is up. I can obviously answer Your Honors' question. Thank you, Your Honor. Yes, and so, Your Honor, that is the argument, but if we look at it, there is not that intertwining, and I think the central element is the affirmative use of authority here from the state, right? The what use of authority? The affirmative use of authority. And to be more plain, we had no authority. So, yes, the cross field says my client is the same as the DCF people, but no, we didn't issue the license. If we suspected an issue, all we could do, we had no way to take any remedial action. All we could do was inform DCF. Did you have an obligation to take some action even if you couldn't, even if your clients weren't the final decision makers? Were they, as state actors, engaged in the system overall under some obligation to do, to proactively say, get these kids out of there? This family is either completely incapable of handling the situation or they're actively abusing the kids because you cannot explain the number of injuries going on here. So from a constitutional sense, I don't think so. From a general reporting sense, yes, and that's what's happened here, but all we could have done was told DCF who knew about the same facts that we did. So at the end of the day, I don't know that there could have been any difference. And, Your Honors, you know, we couldn't even, I know Your Honor asked me to address some of the things in the papers. You know, they talk about, oh, we conducted monthly visits. They were more like status, like is there enough food in the pantry? Do kids have clothes? But we could not officially even assess the children or investigate. If something happened or there was some suspicion, we had to just tell DCF who was aware of these issues. And so, Your Honors, there is no case law, nothing to the contrary, that shows that the position that my clients were in, there was any type of special relationship or duty. So, yes, Your Honor, in conclusion, yes, go ahead. We got you. Okay, I got you. Thank you, Your Honor. All right. I appreciate Your Honor's time. Thank you, Mr. Soriano. Good morning, Your Honors. May it please the Court, I am Diego Navas of New York, New Jersey, and I represent Plaintiff Appelli and Cross Appellant Zenaida Gonzalez, the mother of Allison Chavez, who died tragically on November 8, 2012. I just want to address some of the factual disputes that Your Honors had raised with my adversaries. It would be helpful if you start off, Mr. Navas, by answering Mr. McGuire's assertion that these things that the transportation people said, oh, yeah, it would certainly have been our habit to pass that information along. That didn't happen in the window of time that Cordero and Moody were involved, or at least that's how I understood him to be saying. Is he correct about timing? No, he is not, Judge. I looked it up while I was waiting. That happened on September 25, 2012, which was a few days before the fall from the chair and then about a week before the reporting of it. When you say that happened, what's the that? The reporting of the incidents, there was two incident reports created by the daycare. One was Allison's sister, Sharon, having a busted lip, and Allison having some strange chafing. That was given, that was told to the transportation aides on September 25, 2012. I took their deposition. They said they received that information from the daycare. They went back to their office and they handed it to the caseworker. When I deposed Ms. Cordero, she had no knowledge of it. Those incident reports never made it to the case file. I showed her the contact sheet. So the daycare, the employees, when something happens, they create a contact sheet. They date it. They put their names on it. So there was a record of having them receive the daycare report. That is in the folder. That is in their file. But Ms. Cordero had not seen that. I showed her the contact sheet. She said it's in the file. It should have been there. She didn't see that either. So that all occurred before the fall from the chair. So when you say all that occurred before the fall from the chair, is the assertion then that we've got evidence in the record from the transportation people that they told the caseworker? Yes, that is in the record. Okay. It's in the deposition of the case of the transportation aides. The contact sheet itself is in the record. All right. So there's at least those two incidents, and then there's the fall. Okay. Now, let's say that's the universe of information. And I take it that you're not saying there's any other information. Or is there some other information that you're saying rightly should have been in the mix? Yes, Judge, Your Honor. The fact that Ms. Cordero, upon visiting the home, found these parents to be overwhelmed, that occurred before that date as well. So I thought that was very significant. I know during depositions, several witnesses said if we become aware, even if a home is licensed, even if it's approved, as caseworkers, if we go there and we see evidence that there's chaos or that there's too many children for this foster home, they have an obligation to speak up. They have an obligation to report that, and that would initiate an investigation and possibly removal of the children. Okay. Now, if you look at this and you do take the totality of it, you've got two reports from daycare. You've got the visit from Ms. Cordero where she says things are not in as good of order as they could be. These parents look overwhelmed, and then they have the incident with the fall from the chair, which is the really significant thing, which is followed up by a doctor saying, she's healthy, she's okay. If that's the universe of information, explain to us why it would be appropriate to say, well, those people are in the realm of deliberate indifference. They're in the realm where it's not just caseworkers wrestling with competing constraints and issues and trying to do their best to balance risk and make a judgment about what to do with these kids that will keep them safe. It's deliberately indifferent to leave the kids in the home. Well, that's the question we're being asked or that the judge was being asked before on qualified immunity, right? Like, are you so far gone that this should go in front of a jury? So what's your pitch on that? Why isn't this just exactly what Mr. McGuire said? Like, this is a hard job. They did their best. They shouldn't be vilified and put in stocks and made to pay personal liability. Well, I think they downplayed some of these facts, Your Honor. For example, there were many more daycare incident reports that did not make it to the file, even though there's a witness who said, I would document this, I would tell the state. Again, is that relevant in the time? That's why I'm asking about the time period, because they keep emphasizing those things, they're not relevant because they're not within the relevant time frame. What's the relevant time frame from your perspective, and how many reports were there? There were eight reports. About half of them occurred before the October 1st date and half of them later. So there was more than just those two reports we mentioned before. Well, that's why I'm asking you. Right. And there was testimony from, there was evidence from Breonna Billups, a daycare worker. She was interviewed by IAIU after the fact, and she said she would notice these injuries, she would document them, and she told the state workers about them. And only two actually made it to the hands of the, I'm sorry. She said told the state workers. Which state workers, because of the transfer here? There was transportation aides involved, the Bonnie Harrison, and I forget the other lady's name right now, but their testimony is in the record. I took both their depositions, so you should have a transcript of what they reported. So other than the two that you mentioned specifically, the split lip, the rash in the genital area, other than those two, you say there's another two to make a total of four. Are those other two that got testified to by the daycare worker, are they within the time frame where Cordero and Moody were in a position of responsibility with these children? Yes. On September 17, 2012, Allison was documented to have two bruises on the top of her forehead. On September 25, that's the date of the busted lip and the rash. September 28, a lump on her forehead. September 28, there was two reports on that day, a large bruise on the forehead with white cream that the foster parent had placed on her forehead. So those all occurred before the fall from the chair. All right. And then with respect to the speaking of the fall from the chair, that defendant seemed to downplay that, and they tried to say, well, there was nothing wrong with her. That was a pretty significant fall. The deposition of the foster parent, when I took a deposition, she said she heard a loud boom, and Allison was on the floor. No question. Okay. I don't think, I don't even hear them arguing that's not a serious injury and a serious event. What I hear them saying, I think, you know, and they'll speak for themselves. Mr. McGuire's perfectly articulate on this point. There's, you can't hold a person to fault for a bad event. A single bad event doesn't create any kind of information that would lead to, say, deliberately indifferent. Does it? Well, first of all, I would say there was, what we just discussed a few minutes ago, there was a few things before that. And secondly, this in and of itself, so once this happened, and Ms. Cordero became aware that the foster parents had refused to take her for medical care, she was actually told to do that, and she failed to do that. Once that happens, then they have an obligation to report this. And this is considered a level one violation, the failure to provide medical attention to an infant who's injured. So after, and this was after the fact, the IAIU investigated, and they said we could have closed the house just for that reason, for you not giving, you're not taking Allison to the doctor, to the hospital. That's a level one violation. So the fact that she didn't report that, that's pretty significant. I think the district court judge did at least make that clear. No, they'll say she did report it. She self-reported. She didn't, you know, she didn't, you know, hide Allison for three weeks and not let anybody see the child's injuries. She reached out to her sister. She reached out to Cordero eventually, and, you know, that's that meaningful? When you say that's a level one violation for, quote, not reporting it, she did report it. Well, I was speaking from the point of view of the caseworker, right? So the caseworker becomes aware of it. Yeah. And now she should have been aware of the level one violation, and she has an obligation to report that. The foster mother, I don't know, I'm not sure what her motivation was. Well, when you say reported, maybe I'm misunderstanding. She did talk to her supervisor, right? She got ahold of Ms. Moody. The supervisor was aware, who was also denied summary judgment, Ms. Moody, correct. Right. So Ms. Moody had an obligation as well to report that. No one did anything. To report it where? To the, there's a hotline. How far up the chain does it go? Well, I believe there's a casework supervisor above Ms. Moody, and then I'm not sure who's above that. But the casework supervisor, if I recall from the testimony, she could have initiated an investigation into this home, and they would have removed the children, and then IAIU would have stepped in and conducted an investigation. Okay. I wanted to speak a little bit about my cross appeal with respect to the other defendants, Mr. Henningsen, Ms. Egwu Onyemi, Ms. Avila, and Ms. Serda. The district court granted summary judgment to those parties, and it's the plaintiff's position that there was enough evidence in this record that summary judgment should have been denied. As Your Honor pointed out earlier, the fact should be construed in a light most favorable to the nominee party. Well, this isn't just a question of fact, though, Mr. Nass. We've got law, and it's pretty clear law, that says that the grant of qualified immunity is not immediately appealable because you can address that later. The denial of qualified immunity, since it's supposed to be immunity from suit, that is immediately appealable. That's why it's unquestionably the case that we've got jurisdiction to hear about Ms. Cordero and Ms. Moody's appeal, but it's highly questionable that we've got any basis, as a matter of appellate jurisdiction, to be hearing about Mr. Henningsen and Ms. Egwu Onyemi. I would love to hear the appeal about Mr. Henningsen because some of the things he said were remarkably cavalier, kind of a, I get to it when I get to it. He said a lot. Yeah. But he's not in front of us right now properly under our own case law, is he? Well, there is pendant appellate jurisdiction, and we alluded to it earlier about the facts being intertwined. How could we use pendant appellate jurisdiction to get around case law that's exactly on point and says, grant of qualified immunity, not appealable. You can do it later. Well, as I understood it, the facts are so intertwined that a review of the two case workers who are here today would be meaningless without the other four. I think you're allowed to hear both of those appeals. That's not really our situation, though. It's individualized, at least in terms of these individuals. It's individualized knowledge in whether or not the individuals acted reasonably. True, but they're all, I would lump them together because all six of these defendants are supervising these children in the foster home. They all have a duty and obligation to report wrongdoing if they see it. They all were in a position to do something that could have saved this young girl's life, and they did nothing. An example would have been the fall from the chair, right? So when that happens and then they transfer the file, Ms. Cordero neglects to put that in the transfer case summary. Mr. Navas, sorry to interrupt you, but you're focusing on the facts now, right? And they certainly are egregious in some instances, but really now we're just dealing with a question of law, which is how can we address this now given what the law is? Have you come across anything that would allow us to address these defendants now? I cannot say that I have a case on point that helps me in this regard. I believe it's just the principles that I read about pendant jurisdiction and intertwined facts, and I think if you look at my statement of material facts in support of the summary judgment motion, it's pretty long, but it's pretty detailed, and you'll see that all these defendants... You could get to all that at the end of the case, right? Assuming the case doesn't settle, it goes to trial, you try your case, even if you win against the defendants who are still in the case, you have preserved all your rights with respect to these other two defendants to say, hey, we're entitled to, and frankly as not just these two but others, you've cross-appealed with respect to other defendants, you can bring it all up at the conclusion of the matter, can't you? Well, I can, Your Honors, but there's also the principle of judicial economy. We're all here already. Well, that's true, but please don't worry too much about us. Your Honors, I seem to have read everything, so you've read about Mr. Henningsen, so we're already here. I would say that I think this Court can exercise penitent jurisdiction and hear both of these appeals. Okay. Well, thank you, Mr. Alvis. We'll go ahead and we'll hear from Mr. McGuire on that. Thank you. Please do. Thank you, Your Honors. Before I begin, if there is a question, listen to the question, as opposed to trying to give us your point while the question is coming at you. It's a one-way street. It's not a thoroughfare with traffic moving in both directions. Okay, go ahead. I'm sorry. Go ahead. Thank you. Just to address the totality of the circumstances again, so Mr. Alvis has come up and he said, okay, you have September 25. That's already in the record. That's one report, Your Honor. That's a combination of the busted lip and the chafing, so that's one report. He says there's a September 17 instance where Allison has bruises. September 28 obviously deals with the same incident we're dealing with, with the child falling. That happened on the 27th. So that's the totality of the circumstances. You're talking about one additional report, he says. Still no indication from that that there is ongoing physical or sexual abuse. At best you have one instance of an accident and one instance of if you're seeing. Why don't you respond to the argument that even if you focus on the one incident, it is, quote, a level one violation and it should have, by the department's own rules, have triggered an investigation, a thorough investigation, which very likely may have resulted in taking the child out of the home. But they didn't do what they were supposed to do. Thank you. So their own moody didn't do it. Your Honor, the standards for the state and procedures are different than the constitutional minimums where you can hold people civilly liable. I know that. I understand that. That's not my question. My question is speak to his point that they didn't even follow their own rules. Is he right about that or not? I'm giving you a chance to say, well, that's just not true because of X, Y, and Z. But if he's right, just say, well, he's right, they didn't follow those, but that's not constitutionally or it's not legally significant here. It is both not legally – it's not constitutionally significant. It's also not true that this would have resulted in an automatic. It would have to require a review. I don't have a lot of time, so I'll tell the Court. You can look at NJAC 3A17-2.5, which goes into the factors that are supposed to be analyzed before determining whether to remove a child from a foster home. And I will tell you, Your Honor, it's a 15-part test. Is it true that this kind of event was a Level I violation and should have been reported? It is a potential Level I violation because it deals with the health and safety of the child. And the question was after the caseworker knew, did they feel that the child was still in danger? And the – what Ms. Cordero said was I did not feel like the child was in danger because of all of the other factors. Do you represent Henningsen and Ogniema? Ogniema, I do, Your Honor. You do? Okay, just as a practical matter, is the attitude evinced by Mr. Henningsen legally relevant in any way to the actions of the department employees more generally? I understand this is an individualized assessment, but is that something that can be attended to when looking at how the children here were treated? Because his, you know, he hasn't had a chance to have his side of the whole thing aired out here, we understand. But those things have been put in the record. They're troubling, Your Honor. I agree. That's putting it mildly. So is that the – is that sort of thing as an atmospheric, as the totality of the circumstances, as you put it, something that we should be paying attention to in considering what the department and these two people in the department, you know, how they were behaving? Is it emblematic of anything, or is it just unique to him, and it's not fair to tar them with the Henningsen brush? Your Honor, it is not fair to judge what Ms. Cordero and Moody did, because it's clear that when you look at what they did, you can say these people, they made the wrong call. But they live in a world of uncertainty where there's always a child at risk. And the question was, did Ms. Moody and Ms. Henningsen – How does it get to Henningsen? That's one of the things that's troubled me. Like, why, in the aftermath of this serious event, is this taken away from Cordero and Moody and given to a guy who just can't be bothered? Like, he literally said, you know, I don't look at it. I get to it when I get to it. Like, how does that – is that relevant, that in the immediate aftermath of this serious event, the file gets pulled and sent to somebody else who appears not to care a whit what's happening to the children? Your Honor, the statements that are attributed to him from the deposition are by no means acceptable or the behavior of most people. Yet, nonetheless – You're on board with that. I apologize. I may have led you astray. What I'm trying to get at is the actual moving of the file. Does the moving of the file say anything? Does it speak to the way the department is functioning and at all to Cordero and Moody's responsibility? Your Honor, it doesn't. The fact that one person expressed those views, and even in expressing those views, the record is still clear, and Mr. Henningsen needs to be judged not by the things that he said, but by the things that he did in a very short period of time. If my colleagues will just bear with me for one second. Let me take one last run at it. Leaving Henningsen to the side, is there any relevance to the moving of the file? That is, does it speak to something that could be factually significant in the totality, as you've described it, that the department thinks Cordero and Moody can't be trusted with this file anymore, or this is such a problem, we're going to send it off into the Henningsen black hole, or is there anything about the decision to move it that is appropriate for us to be thinking about? I don't want to put it in the mix if you've got a sound reason to say there's just nothing to that, you shouldn't be thinking about it. But I'm wondering, that's what I'm asking. Your Honor, there is no indication from this factual record that the file was moved due to a dissatisfaction with how Ms. Cordero and or Ms. Moody was handling the file. But there's nothing that says, there's no, there's, I couldn't see anything that explained the move. Is there anything that explains the move? I don't recall seeing in the record, Your Honor, any records regarding that, but I don't think there's any inference to be made from this record that simply because files move, because files move all the time, because of workload, whatever, and I don't think it's a fair inference, particularly if that's going to be used to justify bringing civil liability down on Ms. Cordero and Ms. Moody, who I think the courts can say, this court can say, you know what, if I were in their circumstance, I wouldn't have done that. But I don't think on this record it is fair to look at these people and say they didn't care, because they obviously did. And when you look at what Ms. Moody said, she said, you get that child to a doctor, and you drive her there. We got you. We got you. And, Your Honor, I just want to conclude, because we start and we end with Wesby, and I want to redirect the Court to the type of authority that is not out there, which is even if you accept now in the totality of the circumstances everything else, you have a circumstance where you're saying you have one incident of bruises, of a potential injury. Now we're back into it. So I believe we've given you at least twice the allotted time. We have heard your argument, Mr. McGuire. We do have your papers. We appreciate counsel coming in and arguing today. We've got the matter under advisement, and we're going to call our next case. Thanks very much. I appreciate it. Thank you very much, Your Honors. Can I answer your last question? I do have an answer to that. No. Nothing takes 30 seconds. Yeah, nothing takes 30 seconds. We're done. Thanks very much.